1  DISABILITY RIGHTS ADVOCATES
   SID WOLINSKY (CA Bar No. 33716)
2  JENNIFER WEISER BEZOZA (CA Bar No.  247548)
   MARY-LEE KIMBER (CA Bar No. 239086)
3  2001 Center Street, Fourth Floor
   Berkeley, California 94704-1204
4  Telephone:     (510) 665-8644
   Facsimile:     (510) 665-8511
5  TTY:           (510) 665-8716
   Email:         general@dralegal.org
6
   Attorneys for Plaintiffs
7

8

9  CALIFORNIA FOUNDATION FOR          Case No.: C 07 04608 EDL
   INDEPENDENT LIVING CENTERS;
10 CALIFORNIANS FOR DISABILITY
   RIGHTS, INC.; and MARIAN GRAY,     FIRST AMENDED COMPLAINT FOR
11                                    VIOLATION OF CIVIL RIGHTS &
                                      DISCRIMINATION AGAINST PEOPLE
12            Plaintiffs,             WITH DISABILITIES:  AMERICANS
                                      WITH DISABILITIES ACT; SECTION
13 v.                                 504 OF THE REHABILITATION ACT OF
                                      1973; CALIFORNIA CIVIL CODE § 54, *et
14 CITY OF OAKLAND; OFFICE OF         seq.*; CALIFORNIA GOVERNMENT
   EMERGENCY SERVICES of the Oakland  CODE § 11135, *et seq.*; DECLARATORY
15 Fire Department; DEPARTMENT OF     RELIEF
   HUMAN SERVICES of the City of Oakland;
16 OFFICE OF PARKS AND RECREATION of
   the City of Oakland; RENEE A. DOMINGO,
17 in her official capacity as Director of the
   Office of Emergency Services; ANDREA
18 YOUNGDAHL, in her official capacity as
   Director of the Department of Human
19 Services; AUDREE JONES-TAYLOR, in her
   official capacity as Director of the Office of
20 Parks and Recreation; and DEBORAH
   EDGERLY, in her official capacity as City
21 Administrator of the City of Oakland;

22 Administrator of the City of Oakland;

23            Defendants.

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    Plaintiffs, by their attorneys Disability Rights Advocates, as and for their complaint

2    against Defendants, allege as follows:

3                                    **INTRODUCTION**

4    1.     This case arises out of discrimination by Defendants towards the over 84,000

5    residents of the City of Oakland with disabilities.  The neglect of these disabled residents is the

6    product of Defendants' failure to sufficiently plan to meet the unique needs of people with

7    disabilities during an emergency.  Potential shelter facilities are physically inaccessible and mass

8    care and shelter policies, procedures, and plans for people with disabilities are inadequate or non-

9    existent.

10   2.     Many of the facilities on Oakland's list of potential emergency shelters are

11   inaccessible to people with disabilities.  The problems include inaccessible entrances, paths of

12   travel, bathrooms, showers, signage, and parking.

13   3.     In addition, Oakland does not have a current mass care and shelter plan that

14   addresses the needs of people with disabilities; a database of potential shelters with current and

15   comprehensive accessibility information; an inventory of shelter supplies; or arrangements with

16   community-based organizations, pharmacies, or providers of medical supplies and equipment.

17   4.     Recent catastrophic disasters, such as 9/11 and Hurricanes Katrina and Rita, have

18   made local government officials acutely aware of the critical need to plan to provide mass care

19   and shelter services to large numbers of impacted citizens.  They are also cognizant of the

20   barriers that people with disabilities have faced in past disasters when they tried to access

21   emergency shelter services.  Local officials have acknowledged that Oakland needs to improve

22   its mass care and shelter planning to address the needs of people with disabilities.  Yet, the City

23   of Oakland has been dragging its feet for years, relying on an incomplete plan that is twenty

24   years old.

25   5.     The result of Oakland's failure to adequately plan to meet the shelter needs of

26   people with disabilities is that it cannot assure that when a disaster happens, the City will be able

27   to provide acceptable mass care and shelter services to all residents with disabilities.  Oakland's

28   inability to provide critical emergency services to people with disabilities means that the lives of

this vulnerable population are at extreme risk.

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

6.      Oakland's failure to address the emergency needs of men, women, and children with disabilities is particularly egregious because geographical, environmental and demographic factors make Oakland exceptionally vulnerable to a number of hazards likely to require evacuation to emergency shelters.  Oakland lies within the San Andreas fault system and straddles the Hayward fault, making earthquakes a constant threat.  Oakland is also at risk for uncontrolled fires, flooding, landslides, hazardous waste accidents, and terrorism-related emergencies.

7.      In the last twenty-five years, the City of Oakland has experienced eight Presidential-declared disasters, including the 1989 Loma Prieta earthquake and 1991 Oakland Hills Firestorm.  During many of these disasters, the homes of Oakland residents were destroyed, requiring mass evacuations and the provision of emergency shelter services

8.      When natural or man-made disasters occur, disabled men women, and children are among the people most likely to suffer because they cannot access critical information, transportation, or evacuation services.  They are also more likely to use emergency shelters because they are disproportionately low income and do not have other options.

9.      Because of Defendants' knowing failure to adequately survey potential shelter sites and revise its mass care and shelter policies and procedures to address the needs of people with disabilities, Plaintiffs have been denied equal access to Oakland's shelter facilities, programs, and services, in violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, California Civil Code § 54, *et seq.*, and California Government Code § 11135.  Plaintiffs seek injunctive and declaratory relief as to these ongoing violations of federal and state civil rights laws.

## JURISDICTION

10.      This is an action for declaratory and injunctive relief, brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, as well as California Civil Code § 54 *et seq.* and California Government Code § 11135, *et seq.*

11.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

12.     This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

### VENUE

13.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because:  (i) the organizational Plaintiffs have members within the district; (ii) Plaintiff Marian Gray resides in the district; (iii) Defendants are all located within the district; and (iv) the acts and omissions giving rise to this claim have occurred within the district.

### PARTIES

14.     Organizational Plaintiff California Foundation for Independent Living Centers ("CFILC") is a statewide, non-profit organization made up of twenty-five Independent Living Centers ("ILCs"), which are community-based organizations that provide services and advocacy by and for people with all types of disabilities.  Founded in 1976, CFILC provides information, training, and peer support that enables ILCs to improve their effectiveness in their local communities.  At the state and federal level, CFILC works to coordinate efforts for positive public policy changes that benefit people with disabilities.

15.     CFILC has been a leader in advocating for the rights of people with disabilities in emergency preparedness.  It has organized conferences, produced publications, participated in statewide partnerships, and engaged in legislative advocacy to improve emergency preparedness for people with disabilities.  Earlier this month, CFILC launched a coalition called the "Access 2 Readiness Coalition" to keep the disability community informed about emergency preparedness issues.  CFILC has actively participated in statewide disaster planning so that it can help prepare emergency response and shelter organizations to deal successfully with disability-related needs in a disaster.  CFILC also provides guidance to the individual ILCs in their efforts to prepare their constituents for an emergency.  CFILC's programmatic interests, activities, and expenditures on emergency preparedness are directly and adversely affected by Oakland's failure to appropriately plan to meet the emergency shelter needs of people with disabilities.

16.     Organizational Plaintiff Californians for Disability Rights ("CDR") is the oldest and largest membership organization of people with disabilities in California.  It currently has over 600 members.  CDR's objectives are to improve the quality of life for all persons with

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

3

1  disabilities through education and training and to work to remove access barriers through

2  advocacy and changes in public policy.  A major focus of CDR for the past twenty-five years has

3  been improving access to governmental programs and services for people with disabilities and

4  ensuring that local agencies and state entities obey the laws protecting people with disabilities.

5  Many of CDR's members are active on emergency preparedness issues within their

6  communities.  Accordingly, the interests that CDR seeks to protect through this litigation are

7  germane to its mission and purpose.  Further, CDR's members include people with disabilities

8  who reside in Oakland and have been harmed and continue to experience harm because of

9  Defendants' failure to appropriately plan to meet the emergency shelter needs of people with

10  disabilities.

11      17.    Plaintiff MARIAN GRAY is a citizen of the United States and a resident of the

12  City of Oakland.  Ms. Gray is a sixty-one year old polio survivor who uses a power wheelchair

13  full-time and a ventilator at night.  She is a qualified person with a disability within the meaning

14  of all applicable nondiscrimination law.  Ms. Gray is concerned that the City of Oakland is

15  expending public funds for emergency preparedness in a manner that discriminates against

16  people with disabilities.  In particular, she is concerned that Oakland is not sufficiently prepared

17  to meet the emergency shelter needs of people with disabilities.  Ms. Gray is especially worried

18  that Oakland will be unable to meet her specific emergency needs because it cannot ensure:  (1)

19  that there will be a fully accessible shelter that she can go to that will have sufficient electrical

20  power for her to charge her wheelchair and use her ventilator, and (2) that assistance in securing

21  her daily and emergency medications will be provided.

22      18.    Defendant CITY OF OAKLAND is placed by California's State Emergency Plan

23  and Standardized Emergency Management System ("SEMS")[1] at the first level of response for

24  meeting the disaster needs of people in its jurisdiction.  It is responsible for the protection of life,

25  property, and the environment during a declared emergency.  In particular, the City of Oakland is

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

[1]  SEMS is a system required by California Government Code § 8607 for managing the response to multi-agency and multi-jurisdictional emergencies in California.  It helps unify all elements of California's emergency management organization into a single integrated system.  Local government agencies must use SEMS to be eligible for State funding of certain response-related costs resulting from a disaster.

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

1    responsible for preparing for and providing emergency care and shelter to *all* people made

2    homeless by a natural disaster or other emergency.

3          19.    Defendant OFFICE OF EMERGENCY SERVICES ("OES") is a division of the

4    Oakland Fire Department and is responsible for emergency preparedness, planning, education,

5    and training to ensure a comprehensive, coordinated response by the City to both natural and

6    human-caused disasters.  OES shares responsibility for Oakland's Mass Care and Shelter Plan

7    with the Department of Human Services and the Office of Parks and Recreation.

8          20.    Defendant DEPARTMENT OF HUMAN SERVICES ("DHS") of the City of

9    Oakland is responsible for supporting the City's mass care and shelter effort in concert with the

10   Office of Parks and Recreation, the American Red Cross, and Oakland Unified School District,

11   through the Oakland Office of Emergency Services and the City's SEMS protocol.  It is

12   specifically charged with assessing the availability of City operated shelters and emergency

13   supplies.  DHS shares responsibility for Oakland's Mass Care and Shelter Plan with the Oakland

14   Office of Emergency Services and the Office of Parks and Recreation.

15         21.    Defendant OFFICE OF PARKS AND RECREATION ("OPR") of the City of

16   Oakland is responsible for coordinating the opening and operations of local shelters during an

17   emergency with the American Red Cross, the Department of Human Services, and Oakland

18   Unified School District.  It is also responsible for coordinating the opening of Disaster

19   Application Centers with the Oakland Office of Emergency Services and the State Office of

20   Emergency Services.  OPR shares responsibility for Oakland's Mass Care and Shelter Plan with

21   the Oakland Office of Emergency Services and the Department of Human Services.

22         22.    Defendant RENEE A. DOMINGO is the Director of the Oakland Office of

23   Emergency Services.  She is sued in her official capacity.

24         23.    Defendant ANDREA YOUNGDAHL is the Director of the Department of Human

25   Services of the City of Oakland.  She is sued in her official capacity.

26         24.    Defendant AUDREE JONES-TAYLOR is the Director of the Office of Parks and

27   Recreation of the City of Oakland.  She is sued in her official capacity.

28

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

25.    Defendant DEBORAH EDGERLY is the Oakland City Administrator and, as such, is the City's chief administrative officer.  As City Administrator, Ms. Edgerly has the power and duty to execute and enforce all laws, ordinances, and policies of the City Council and to administer the affairs of the City.  She is sued in her official capacity.

**FACTS**

**A.    The City of Oakland Is Exceptionally Vulnerable to Emergencies**

26.    Due to location, geography and history, Oakland is susceptible to the following emergency conditions:

   a.    Earthquakes on at least three known active faults;

   b.    Urban firestorms in the hill areas;

   c.    Multi-alarm fires from old building stock;

   d.    Severe weather conditions resulting in flooding, landslides, tree damage and power outages;

   e.    Hazardous material spills or toxic releases caused by transportation and/or industrial accidents;

   f.    Civil disturbance; and

   g.    Terrorist incidents.

27.    Since 1983, the City of Oakland has experienced eight Presidential-declared disasters, including the 1989 Loma Prieta earthquake, 1991 Oakland Hills Firestorm, the 1997 El Nino winter storms, and the 1998 La Nina winter storms.  During many of these disasters, the homes of Oakland residents were destroyed, requiring mass evacuations and the provision of emergency shelter services.  For instance, following the Loma Prieta earthquake, more than 12,000 Oakland residents were left homeless and more than 18,000 homes were damaged. Following the 1991 Oakland Hills Firestorm, more than 3,000 homes were destroyed.

28.    Oakland has been shaken by moderate-to-major earthquakes approximately sixty times in the recorded history of the area.  United States Geological Survey ("USGS") scientists have concluded that there is a 62% probability of one or more major earthquakes (magnitude 6.7 or greater) striking the Bay Area between the years 2003 and 2032.

29.    The Hayward fault has the highest probability of producing a major quake.  In fact, the Hayward fault is considered "one of the most hazardous in the world" because of its

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

1    high "slip rate;" its demonstrated ability to generate large, surface-rupturing earthquakes; and its

2    location through a heavily urbanized area.

3        30.    The Association of Bay Area Governments ("ABAG"), in a 1996 report entitled

4    "Shaken Awake," predicted that, if there were an earthquake on the Hayward fault line in the

5    next thirty years, the shelter population in Oakland would be a minimum of 17,500 people and

6    could be as large as 42,000 people.

7        31.    As one of the oldest cities in the state, Oakland's densely populated jurisdiction

8    (7,126 persons per square mile in comparison to 217 persons per square mile in California)

9    includes old building stock (much of which is un-reinforced masonry) and an aging

10    infrastructure.  Un-reinforced masonry ("URM") buildings are the structures most likely to

11    collapse from strong ground shaking or to require demolition afterward.  There are

12    approximately 870 buildings on Oakland's list of potentially hazardous URM buildings.

13        32.    It is estimated that, following an earthquake, up to 92% of the URM buildings in

14    Alameda County will be uninhabitable.  Many of these older buildings provide low income

15    housing.  Because of the rapid rise in housing costs in recent years, there are fewer alternatives to

16    these buildings when they become uninhabitable due to a disaster.  The result is that emergency

17    shelters will need to be kept open for a longer period of time.  This is precisely what happened

18    following the Loma Prieta earthquake, which destroyed 1300 units of Oakland's low income

19    housing stock.

20        33.    Oakland is also at a higher risk for structural fires than most other jurisdictions in

21    California because of its relatively old and dense development pattern.  In the past, strong

22    earthquakes in the Bay Area have been followed by fires.  The threat of extensive fire damage is

23    greatest following a major earthquake, at which time the severity of fires may be compounded by

24    the accompanying failure of water mains.

25        34.    The Oakland hills are a "fire-dependent ecosystem," meaning that wildfires occur

26    there every year, especially in late summer and early fall when the area's natural vegetation is

27    dry and extremely flammable.  Large fires in the Oakland Hills are anticipated by city officials

28    every ten to twenty years.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

7

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

35.     Given that 42.6% of the land in Alameda County is located in "Wildland Urban Interface Wildfire Threat" areas, an uncontrollable wildfire could threaten a staggering amount of housing.  During the first three hours of the 1991 Oakland Hills Firestorm, the fire consumed one house every eleven seconds.  It ultimately resulted in 25 deaths, 150 injuries, and the destruction of more than 3,000 homes, making it the costliest wildfire in United States history.  Due to repair and rebuilding, the number of people and homes currently in harm's way is roughly the same as it was before the 1991 Firestorm.

36.     Oakland also faces other potential hazardous conditions that have forced evacuations and may necessitate emergency shelter services.  Excess rain has and will likely continue to result in flooding, landslides, tree damage, and power outages.  Over twenty significant landslides have occurred in Oakland during the last seven decades.  Most hillside development in Oakland predates the imposition of grading and slope requirements, making homes more susceptible to landslide damage.

37.     As a port city with a great deal of industry, Oakland is also prone to industrial accidents, such as hazardous material spills, which would require mass evacuations.  Finally, as a large city in the Bay Area with a dense population, Oakland is a potential terrorist target.  In July 2007, the United States Department of Homeland Security designated the Bay Area as one of the six urban areas in the country most at risk for terrorist attacks.

**B.     Emergencies Disproportionately Affect Persons with Disabilities**

38.     When a disaster occurs, people with disabilities and the elderly are more likely to suffer its direct impact.  Many people with disabilities are unable to evacuate themselves, see approaching danger, or hear announcements to evacuate, making them especially vulnerable to natural disasters.  Evacuation announcements are often made using loudspeakers on patrol cars and television broadcasts often fail to include captions, leaving the deaf and hard of hearing without critical emergency information.  The lack of accessible transportation makes it extremely difficult for people with disabilities to evacuate and/or travel to emergency shelter.

39.     People with disabilities are disproportionately dependent on electricity because they need to power much of their assistive technology, such as wheelchairs, scooters, and communications software.  In addition, people with certain disabilities are temperature-sensitive

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  and cannot be exposed to extreme temperatures, which may result from power outages.  Thus,

2  utility outages alone may require people with disabilities to seek emergency shelter, if available.

3  40.    Past disasters have shown that low-income families are nearly ten times more

4  likely to seek public shelter in a disaster versus more moderate to upper income families.  People

5  with more resources generally can find alternatives to public shelters, whereas people who have

6  a low income cannot.  In addition, low-income people are more likely to live in multi-family

7  homes, which are more vulnerable to collapse because they are not typically reinforced.  Because

8  people with disabilities are disproportionately low-income, they tend to be disproportionately

9  represented among shelter residents.

10  41.    In addition to the people with disabilities who routinely reside in Oakland, there

11  will be untold additional numbers of people with injuries and temporary disabilities who will

12  need access to temporary shelter and support services in an emergency.

13  **C.    Experiences of People With Disabilities in Past Disasters**

14  42.    After the Loma Prieta earthquake in 1989, many of the first aid stations in shelters

15  lacked the capacity to keep certain life-sustaining medications.  Food, water, supplies, and

16  disaster relief applications were disseminated in areas of shelters that were inaccessible to

17  wheelchair users.

18  43.    After the 1994 earthquake in Northridge, California, trash and glass were

19  scattered everywhere, making it extremely difficult for wheelchair users and the visually

20  impaired to navigate the streets.  Elevators were not functioning and there was very little

21  accessible transportation available, making it nearly impossible for most people with disabilities

22  to get to shelters.

23  44.    Many people with disabilities who were able to get to emergency shelters after the

24  Northridge earthquake were turned away when they arrived.  Some people were inappropriately

25  referred to medical facilities when shelter personnel misidentified their disabilities as acute

26  medical conditions.  A deaf person was denied services by a shelter because no one understood

27  sign language and individuals with cerebral palsy and multiple sclerosis were denied admission

28  to shelters because they were perceived as being under the influence of drugs or alcohol.  Other

people with disabilities learned when they arrived at shelters that guide dogs and service dogs

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

1   were not allowed, they could not get to the bathrooms because they were located upstairs, or

2   shower stalls were inaccessible.

3        45.    The winter storm flooding in Oakland in 1997 required the evacuation of over

4   150,000 Californians, 1,000 of whom resided in nursing facilities or home health care settings.

5   As shelter populations grew, available medical resources became overwhelmed, placing

6   medically fragile individuals at risk.

7        46.    During the 2003 wildfires in Southern California, many individuals who require

8   mobility aids to walk were evacuated and brought to emergency shelters without those items.  As

9   a result, they were restricted to their beds.  Volunteers had to carry them to the restrooms, when

10  needed.  Evacuation planning did not include vehicles that could also transport wheelchairs and

11  walkers so evacuees with disabilities could maneuver throughout the shelters without assistance.

12       47.    Many of the shelters used in the 2003 wildfires were inaccessible to people with

13  mobility disabilities.  Those who use service animals were not initially allowed to bring their

14  animals into the shelters.  The deaf were unable to receive critical information in many of the

15  shelters because there were no interpreters available, they couldn't understand the public address

16  systems, and televisions were not captioned.  People who rely on specialized medication and did

17  not have prescriptions or a supply with them were placed in danger due to medical conditions.

18  Emergency telephone access was provided through prior arrangements with a vendor that used a

19  trailer that had no telephones located within reach of people using wheelchairs and no

20  telecommunication devices for the deaf.

21       48.    After Hurricane Katrina, community-based organizations that serve people with

22  disabilities complained they were unable to obtain information about where emergency shelters

23  were opening, how to transport consumers there, or what types of disabilities the shelters could

24  accommodate.  As a result, many people with disabilities were transported to nursing homes

25  where they could not maintain their independence.

26       49.    Many of the shelters used during Hurricane Katrina were not physically

27  accessible to people with disabilities.  Some shelters refused services to people with service

28  animals and obvious disabilities.  Almost all shelters were unable to make their programs

accessible to people with disabilities or to meet basic living needs of people with disabilities.

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   For example, essential medical services were offered on upper floors of shelters with no elevator

2   access.  People who had lost their wheelchairs during evacuation had no way to stand in line for

3   shelter services.  In addition, shelters were not equipped with durable medical equipment,

4   medications for people with mental illness, or insulin for diabetics.  Most shelters had no sign-

5   language interpreters and no written announcements, which meant that deaf evacuees were

6   denied access to the information conveyed over loudspeakers.

### D.    The Elements of Comprehensive Mass Care and Shelter Planning for People with Disabilities

50.    The disability community has been reporting problems with emergency services for decades.  In order to prevent the above-described experiences of people with disabilities during disasters, emergency planning must take into account the unique needs of people with disabilities, particularly with respect to mass care and shelter.

51.    A mass care and shelter plan must describe the roles and responsibilities of city agencies in the provision of mass care, establish potential shelter locations, and list the tasks necessary to support shelter sites and ensure that services and information will be accessible to people with disabilities.

52.    In September 2003, Alameda County Operational Area funded the development of a planning guide for local governments, entitled "A Guide for Local Jurisdictions in Care and Shelter Planning."  The guide details all of the components that are needed for a city to appropriately plan to provide mass care and shelter during a disaster.  The following are among those components:

a.    Identify and survey shelter facilities;

b.    Designate primary and secondary shelter facilities based on size and accessibility;

c.    Develop a plan to provide people with disabilities with information about accessible sheltering options;

d.    Develop statements of understanding with all potential shelter facilities;

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1          e.      Develop a statement of understanding with the American Red Cross;

2          f.      Provide training to city employees who will staff and manage disaster

3    shelters;

4          g.      Develop plans to make accommodations where facilities have barriers that

5    impede full access for people with disabilities;

6          h.      Conduct a pre-occupancy inventory of potential shelter sites to determine

7    what operational supplies may already be in place and develop a plan to obtain needed shelter

8    supplies and equipment;

9          i.      Establish vendor agreements with local pharmacies to provide emergency

10    replacement prescriptions and medical equipment for the elderly and people with disabilities

11    (e.g., orthopedic braces, wheelchairs, breathing aids, and colostomy bags);

12          j.      Plan for the storage of medications;

13          k.      Pre-identify shelter sites with back-up generators;

14          l.      Develop a resource list of community mental health providers and

15    services to call upon, if needed;

16          m.      Identify local para-transit resources for the transport of wheelchair users;

17          n.      Develop a plan to address the information needs of persons who are deaf,

18    blind, or non-English speaking;

19          o.      Identify and develop relationships with community-based organizations

20    that support vulnerable populations so that they can assist with care and shelter operations; and

21          p.      Provide disaster planning information to licensed care facilities to support

22    their emergency preparedness efforts.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

53.    The City of Oakland's SEMS Emergency Plan,[2] dated August 2002, requires that all potential shelter sites be surveyed and meet all Americans with Disabilities Act ("ADA") access requirements, which include, but are not limited to:

  a.    accessible entrances/exits and paths of travel to and within the shelter;

  b.    accessible parking close to the shelter;

  c.    accessible restrooms and showers (if offered); and

  d.    accessible signage (e.g., Braille) for persons with vision disabilities.

When potential shelter facilities are assessed, the City must determine the level of ADA compliance and the need for any modifications. City employees must be trained in what constitutes accessible facilities so that they can appropriately evaluate potential shelter sites.

54.    Physical access problems are often created by policies and procedures in place at the shelter. Accordingly, policies and procedures for emergency shelter services must take into account the needs of persons with disabilities. There must be policies and procedures for, but not limited to, the following:

  a.    Providing para-transit or other accessible form of transportation from inaccessible shelters to accessible shelters;

  b.    Placing key services, such as the infirmary, in accessible areas;

  c.    Ensuring sufficiently wide paths of travel through sleeping areas;

  d.    Permitting service animals within emergency shelters; and

  e.    Providing information in accessible formats for people with sensory and cognitive disabilities.

55.    City employees who manage and staff shelters must also be trained to be sensitive and responsive to the needs of people with disabilities, from intake to the provision of medications and supplies to the dissemination of information.

---

[2]  Oakland's SEMS plan is distinct from its outdated Mass Care and Shelter Plan.

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

**E.    Oakland Has Not Adequately Planned to Meet the Mass Care and Shelter Needs of People with Disabilities**

56.    Oakland is not prepared to meet the unique needs of people with disabilities during an emergency;  potential shelter facilities are physically inaccessible and policies, procedures, and plans for people with disabilities are inadequate or non-existent.

57.    While Oakland has identified a number of potential shelter facilities (i.e., churches, schools, and park recreation centers), the City's shelter list does not have current contact information for those facilities.  More importantly, the City lacks comprehensive information about the accessibility of potential sites.  Without this information, Oakland is unable to provide people with disabilities with information about accessible sheltering options. Nor can it ensure that it will be able to provide equal access to its shelter services to people with disabilities.

58.    The result of Oakland's failure to maintain current and comprehensive information about potential shelter sites is that Oakland has designated shelter facilities that are not physically accessible.  For example, some of the facilities on the list have multiple levels with no elevators, no Braille signage, doorways that are too narrow, or restrooms and/or showers that are completely inaccessible to wheelchair users.

59.    Oakland has also failed to revise its Mass Care and Shelter Plan from the 1980s to address the needs of people with disabilities.  As a result, the City lacks many, if not all, of the planning elements described above.  For example, Oakland has:

a.    No plan for modifying shelters that do not meet ADA requirements so that people with disabilities will have full access to all services being provided at the shelter facility;

b.    No memoranda of understanding between the City and potential shelter sites;

c.    No inventory of shelter supplies;

d.    No arrangements to provide replacement prescriptions or medical equipment;

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

e.      No arrangements for the transportation of people with disabilities from inaccessible shelters to accessible shelters;

f.      No plan to meet the information needs of people who are deaf, blind, or non-English speaking;

g.      No arrangements with community-based organizations that service special needs populations;

h.      No plan to meet the needs of people who choose to home-shelter on their property;

i.      No plans to assist the County in serving people with disabilities who are placed in the medically fragile shelter; and

j.      No list of residential care facilities that have viable plans for continued care and evacuation of clients in an emergency.

60.     The City is aware that it needs to revise and update its Mass Care and Shelter Plan.  In a comprehensive review of the City's emergency response capabilities in November 2005, directed by the Oakland City Council, the City found that it needs to improve its emergency planning to more fully address special needs populations.  The Office of Emergency Services indicated that it plans to address the needs of people with disabilities in its next revision of the City's Mass Care and Shelter Plan.

61.     In November 2006, an engineering design firm submitted a proposal for the preparation of a care and shelter plan for the City of Oakland that would address, among other things, the needs of people with disabilities.  Almost one year later, Oakland has yet to contract with that firm or any other company for assistance with the development of its care and shelter plan.  Nor has it developed or begun implementing such a plan on its own.  Without a current mass care and shelter plan, Oakland cannot provide any assurance that, if a natural disaster happened tomorrow, it is prepared to meet the unique shelter needs of people with disabilities.

1    62.    Oakland cannot depend on the American Red Cross to relieve it of its planning

2  responsibilities.  The City must be prepared to provide mass care and shelter services prior to the

3  arrival of support from the American Red Cross, which may take as long as five days.  If and

4  when the American Red Cross takes over management of emergency shelters in Oakland, the

5  City is still responsible for meeting the needs of people with disabilities.

6              **FIRST CAUSE OF ACTION**
              **(Violation of Americans with Disabilities Act)**

7

8    63.    Plaintiffs incorporate, by reference herein, the allegations in paragraphs 1 through

9  62, inclusive.

10   64.    Title II of the Americans with Disabilities Act ("ADA") prohibits a public entity

11  from excluding a person with a disability from participating in, or denying the benefits of, the

12  goods, services, programs and activities of the entity or otherwise discriminating against a person

13  on the basis of disability.  42 U.S.C. § 12132.

14   65.    The implementing regulations of Title II of the ADA require that, in providing

15  any aid, benefit or service, a public entity may not deny a qualified individual with a disability

16  the opportunity to benefit from any such aid, benefit or service.  28 C.F.R. § 35.130(b)(1)(i).

17   66.    The Title II implementing regulations also state that "a public entity may not, in

18  determining the site or location of a facility, make selections (i) that have the effect of excluding

19  individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to

20  discrimination; or (ii) that have the purpose or effect of defeating or substantially impairing the

21  accomplishment of the objectives of the service, program or activity with respect to individuals

22  with disabilities."  28 C.F.R. § 35.130(b)(4)(i)-(ii).

23   67.    The Title II implementing regulations further provide that an individual with a

24  disability shall not be excluded from participation in, or be denied the benefits of the services,

25  programs, or activities of a public entity because a public entity' facilities are inaccessible to or

26  unusable by individuals with disabilities.  28 C.F.R. §35.149.

27   68.    Plaintiff MARIAN GRAY is a qualified individual with a disability within the

28  meaning of the ADA.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

69.    By failing to plan to meet the mass care and shelter needs of people with disabilities, Defendants have excluded them from participation in, denied them the benefits of, and discriminated against them in its mass care and shelter program and services.

69.    Defendants have failed to develop policies, practices and/or procedures that address the mass care and shelter needs of individuals with disabilities, and, as such, Defendants deny individuals with disabilities the opportunity to benefit from its mass care and shelter program and services.

70.    Defendants have selected facilities to be used as emergency shelters that are physically inaccessible or unusable by people with disabilities and therefore have the effect of excluding individuals with disabilities from and denying them the benefits of the City's mass care and shelter program and services.

71.    Defendants' conduct constitutes ongoing and continuous violations of the ADA, and unless restrained from doing so, Defendants will continue to violate the ADA.  This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.  Consequently, Plaintiffs are entitled to injunctive relief pursuant to section 308 of the ADA (42 U.S.C. § 12188), as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CAUSE OF ACTION
### (Violation of Section 504 of the Rehabilitation Act of 1973)

72.    Plaintiffs incorporate, by reference herein, the allegations in paragraphs 1 through 71, inclusive.

73.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the implementing regulations, prohibit discrimination against people with disabilities by recipients of federal funding.  Section 504 provides, in pertinent part, that:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

74.    Plaintiff MARIAN GRAY is a qualified individual with a disability within the meaning of Section 504.

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

75.    Defendants receive federal financial assistance to provide mass care and shelter services during an emergency.

76.    By failing to plan to meet the mass care and shelter needs of people with disabilities, Defendants have excluded them from participation in, denied them the benefits of, and discriminated against them in programs and activities that receive federal financial assistance, solely by reason of their disabilities, in violation of 29 U.S.C. § 794 and the implementing regulations.

77.    As a proximate result of Defendants' violations of Section 504 of the Rehabilitation Act, Plaintiffs have been injured as set forth herein.

78.    Plaintiffs have no adequate remedy at law and unless the relief requested herein is granted, Plaintiffs will suffer irreparable harm in that they will continue to be discriminated against and denied access to Defendants' mass care and shelter program.  Consequently, Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION
### (Violation of California Civil Code § 54, *et seq.*)

79.    Plaintiffs incorporate, by reference herein, the allegations in paragraphs 1 through 78, inclusive.

80.    The emergency shelter facilities under the control of Defendants constitute places of public accommodation and/or places to which the general public is invited within the meaning of California Civil Code §§ 54.1 and 54.3.

81.    Defendants have and are violating Plaintiffs' rights under California Civil Code § 54, *et seq.*, by denying Plaintiffs full and equal access to and use and enjoyment of emergency shelter facilities and services due to the acts and omissions alleged herein.

82.    Defendants' discriminatory conduct alleged herein includes, *inter alia*, the violation of the rights of persons with disabilities set forth in Title II of the ADA and accompanying regulations, all of which have been expressly incorporated into California Civil Code § 54, *et seq.*, since January 1, 1993.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    83.    Defendants' actions constitute a violation of Plaintiffs' rights under California

2    Civil Code § 54, *et seq.*, and therefore Plaintiffs are entitled to injunctive relief remedying the

3    discrimination.

4    84.    Plaintiffs are also entitled to reasonable attorneys' fees and costs.

5    WHEREFORE, Plaintiffs pray for relief as set forth below.

6                        **FOURTH CAUSE OF ACTION**
                **(Violation of California Government Code § 11135, *et seq.*)**

7

8    85.    Plaintiffs incorporate, by reference herein, the allegations in paragraphs 1

     through 84, inclusive.

9

10    86.    California Government Code § 11135 and the regulations promulgated thereunder

11    prohibit discrimination against people with disabilities by any program or activity funded by the

12    State.  Section 11135 provides, in pertinent part, that:

13                No person in the State of California shall, on the basis of . . .
                disability, be unlawfully denied the benefits of, or be unlawfully
14                subjected to discrimination under, any program or activity that is
                funded directly by the state or receives any financial assistance
15                from the State.

16    87.    Defendants receive financial assistance from the State of California to provide

     mass care and shelter services during an emergency.

17

18    88.    Through their actions and inactions, by refusing to provide Plaintiffs full and

19    equal access to their emergency mass care and shelter services, Defendants have denied Plaintiffs

20    the benefits of, or unlawfully subjected them to discrimination, in such programs and activities

21    solely because of their disabilities in violation of Government Code § 11135 and the regulations

     promulgated thereunder.

22

23    89.    As a proximate result of Defendants' violations of § 11135, Plaintiffs have been

24    injured as set forth herein.

25    90.    Plaintiffs have no adequate remedy at law.  Unless the relief requested herein is

     granted, Plaintiffs will suffer irreparable harm in that they will continue to be discriminated

26    against and denied full access to Defendants' facilities, programs, services, and activities on the

27    basis of disability.  Consequently, Plaintiffs are entitled to injunctive relief and reasonable

28    attorneys' fees and costs.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION
### (Declaratory Relief)

91.    Plaintiffs incorporate, by reference herein, the allegations in paragraphs 1 through 90, inclusive.

92.    Defendants deny failing to comply with applicable laws prohibiting discrimination against persons with disabilities in violation of the Americans with Disabilities, Act, Section 504 of the Rehabilitation Act, California Civil Code § 54, *et seq.*, and California Government Code § 11135, *et seq.*

93.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    A declaration that Defendants' failure to adequately plan to meet the emergency mass care and shelter needs of people with disabilities violates the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, California Civil Code § 54, *et seq.*, and California Government Code § 11135, *et seq.*

2.    An order and judgment enjoining Defendants from violating the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, California Civil Code § 54, *et seq.*, and California Government Code § 11135, *et seq.*, and requiring Defendants to comprehensively survey the accessibility of all potential shelter sites and develop and implement a mass care and shelter plan that addresses the emergency needs of people with disabilities.

3.    Plaintiffs' reasonable attorneys' fees and costs.

4.    Such other and further relief as the Court deems just and proper.

1    RESPECTFULLY SUBMITTED,

2
     DATED:  October 1, 2007                    DISABILITY RIGHTS ADVOCATES
3

4

5

6                                       By:    _____/s/_____
                                               JENNIFER WEISER BEZOZA
7                                              Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*DISABILITY RIGHTS ADVOCATES*
*2001 CENTER STREET, FOURTH FLOOR*
*BERKELEY, CALIFORNIA 94704-1204*
*(510) 665-8644*

*CFILC, et al., v. City of Oakland, et al.* **Case No.: C 07 04608 EDL**
**FIRST AMENDED COMPLAINT**

21